Opinion filed January 31, 2013



In The

# Eleventh Court of Appeals

No. 11-11-00028-CR

## ROBERT RUBALCADO, Appellant
## V.
## STATE OF TEXAS, Appellee

**On Appeal from the 358th District Court**
**Ector County, Texas**
**Trial Court Cause No. D-36,711**

## MEMORANDUM OPINION

In the fall of 2002, appellant, Robert Rubalcado, allegedly began to sexually assault his stepdaughter, J.S., who was eleven years old at the time. The assaults began in Midland and continued after the family moved to Odessa in 2004. In 2009, appellant was indicted in Ector County for the abuse that occurred in Odessa: nine counts of indecency with a child, four counts of sexual assault of a child, and seven counts of aggravated sexual assault of a child. In less than one hour of deliberations, the jury found him guilty of all offenses. The jury assessed the maximum punishment on each of the twenty counts: twenty years imprisonment on each count of indecency with a child and sexual assault of a child, and life imprisonment on each count of aggravated sexual assault of a child. The sentences were to run concurrently. No fines were assessed.

Appellant raises the same four issues on appeal that he raised in his motion for a new trial: (1) whether trial counsel provided ineffective assistance of counsel, (2) whether the trial court erred in not granting a mistrial based on a violation by the State of an order in limine, (3) whether the trial court erred in admitting recorded pretext telephone conversations into evidence, and (4) whether the State's objection that referred to appellant's choice not to testify constituted prosecutorial misconduct that requires a new trial. We find that trial counsel did not provide ineffective assistance and that the trial court did not err in admitting the pretext telephone conversations into evidence. We find that the State did violate the order in limine and did engage in prosecutorial misconduct in its objection during defense counsel's final argument. We also find, however, that the trial court did not err in not declaring a mistrial and that the trial court did not abuse its discretion in denying appellant's motion for a new trial. We affirm.

*Background Facts*

At the time of trial, J.S. was eighteen years old and living in Midland. She was a certified nurse's assistant and was working on a degree in pediatric nursing at Midland College. In addition, J.S. worked at a nursing home.

J.S. first met appellant in 2002 when she returned home from a summer visit with her aunts in Dallas. She was eleven. Her mother, brothers, and J.S. lived in Midland, and appellant moved in with them. Appellant and J.S.'s mother slept in one bedroom, and J.S. and her two brothers slept in the other bedroom. However, J.S. also slept in the living room by herself because appellant wanted her to sleep there.

The family was watching "Planet of the Apes" when appellant made the first move that made J.S. feel uncomfortable. Her mother and brothers had gone to the kitchen. Appellant told her to be quiet, and through her clothes, he felt of her private area. He then grabbed her hand and put it on top of his private area. Appellant stopped when J.S.'s mother and brothers came back in. She was scared and did not tell anyone.

Appellant wanted J.S. to sleep in the living room. When everyone else was asleep, he came in and touched her private area and had her touch his. Appellant took her hand and rubbed it up and down until "white stuff came out." The abuse progressed to his requiring J.S. to perform oral sex on him and then to sexual intercourse. According to J.S., appellant "put his penis into her vagina too many times to count. It just slowly progressed, and he would also put his private inside her bottom." J.S. was scared, and the penetrations hurt. J.S. said it seemed as

2

if appellant did something every night or every other night. If her mother woke up, appellant ran "to the bathroom" and then walked out "like he was coming out of the bathroom."

After they moved to Odessa in 2004, the abuse became worse. When J.S. and appellant were left alone, appellant sexually abused her during the day as well. The house in Odessa also had two bedrooms. J.S.'s older brother moved out. Appellant's mother slept in one room; J.S., her mother, and appellant slept in the other bedroom. J.S.'s younger brother initially slept in that room also, but appellant soon required him to sleep in the living room almost every night. J.S. slept on the floor at the foot of the bed where her mother and appellant slept. The door to the bathroom was a few feet from where appellant continued to abuse J.S.; if her mother woke up, appellant would quickly go into the bathroom. J.S. did not tell her mother of the abuse because she was scared to do so. She thought that perhaps her mother knew. As the abuse continued, J.S. began to get low grades and to get into trouble.

J.S. testified that each time her mother set up an appointment at High Sky Children's Ranch to see if J.S. needed help, appellant would become defensive and tell her mother that the sessions were not needed. He told J.S. to tell her mother that J.S. did not need a counseling session.

J.S. described appellant as controlling. J.S. did not have any boyfriends because appellant did not want her to talk to boys. J.S. said that appellant's restrictions did not bother her very much because she had continued to attend school in Midland and did not have any friends in Odessa. J.S. recounted sexual abuses by appellant at Jet Specialty where appellant worked; she described the small apartment there that was used by the owner at times. She remembered that, on one occasion, they took a shower after sexual relations and that appellant told her not to get her hair wet so that her mother would not ask questions.

In addition to attending school in Midland in 2008 and 2009, J.S. worked at Peppermint Plantation in Midland, teaching eight-year-old girls. J.S.'s supervisor was Veronica Ramirez. Veronica said that she knew J.S. for six or seven months before she learned in February 2009 of J.S.'s problems. J.S. said she sent a message to Veronica on Myspace, telling Veronica that she needed to talk. Veronica called her, and they began discussing appellant's abuse of J.S. J.S. and Veronica testified that Veronica then called her supervisor, Shea Showers, because Shea knew the telephone number of Child Protective Services. As a result of Shea's call to CPS, J.S.'s mother picked her up from school on February 19, 2009, for an interview at Harmony Home.

3

As J.S. and her mother drove to Harmony Home, J.S.'s mother called appellant. He asked J.S.: "Did you tell somebody what happened?" "Why?" "Why did you do that?" and said: "You promised me that you wouldn't say anything." Appellant then told J.S. that, when he was little, the same thing happened to him. He told her that he had learned to live with it because he was still around the person who did it to him. J.S. said that it sounded as if appellant had been crying.

After the Harmony Home interview, J.S. and her mother and her little brother moved to a motel. Shortly thereafter, Veronica met J.S. and her mother. It was agreed that J.S. would stay with Veronica, and J.S. has lived with Veronica's family since February 2009.

Veronica testified that she has lived in Midland for twenty-seven years and has been married to Jesus Ramirez for eleven years. They have three children who are ten, eight, and four years old. Veronica said that J.S. is like a big sister to her children and that she and Jesus treat J.S. as a daughter. Veronica recounted how J.S. told her about the sexual abuse.

J.S. did not want to go to therapy at Harmony Home in Odessa because appellant worked not far from there. Harmony Home transferred her case to Midland where she started therapy with Steve Hansen in March 2009. Hansen testified that J.S. told him how hard it was to live with memories of the abuse, how hard it was to be around people, and how hard it was to concentrate on daily tasks. J.S. stated that Hansen's counseling was helping and that Hansen was the one who put her in touch with Detective Kay Therwanger of the Midland Police Department. J.S. also said that her relationship with her mother was not very good; they discussed what appellant did when they left Harmony Home after the interview, but they have not talked about the subject since that time.

J.S. went with Detective Therwanger and Veronica to have a SANE (sexual assault nurse examination) at Midland Memorial Hospital. She has continued to be seen by doctors since the examination. She went to a surgeon, Dr. Dragun, who used a small camera to see if he could find out why she was always having problems and burning when she went to the bathroom. Dr. Dragun did one surgery, and then Dr. Saba did another one. However, the surgeries at Midland Memorial Hospital have not fixed J.S.'s problem, and she was seeing Dr. Moss at Texas Tech.

4

The SANE provided reasons why J.S. continues to have problems physically and psychologically. Cori Armstead introduced and explained State's Exhibit No. 5, the SANE record of J.S. at Midland Memorial Hospital. Armstead was the director of emergency services at the hospital, and she was also the director and coordinator for the sexual assault program. Armstead has been a registered nurse for sixteen years and was working on a masters at Texas Tech.

Armstead explained that, from birth until a girl is two years old, the hymen is estrogenized so that the skin is very elastic and will stretch. From the age of two until the age of puberty (around fourteen), the estrogen levels fall and the hymen skin is very thin, like tissue paper, and tears easily. During that period, if anything penetrates the vaginal opening, the skin tears; the edges cannot go back together and heal in the condition that the hymen was before the penetration. Armstead then pointed out that J.S.'s hymen had irregular edges. She could not say what caused the jags, "but it was not smooth and symmetrical like you see in children that have not been penetrated or have not begun having sexual intercourse." Armstead explained that J.S.'s hymen was "very jagged, like a sawtooth pattern all the way around."

Armstead stated that the examiners always look at both the vaginal area and the anal area on all of their victims. She noted that there was a healing tear between "5:00 and 6:00 o'clock" on J.S.'s bottom. Armstead explained that, due to vascularity in that area, injuries that occur in that area normally heal in three or four days. But "[i]f that area keeps being penetrated, those areas can keep being broke open." Armstead read from her report that J.S. had stated that it hurt every time she had a bowel movement and that she would often see blood; however, J.S. denied having episodes of constipation. It is clear from the record that Armstead did not think that constipation could have caused the injury to J.S. The report reflected that J.S. had stated that "the pain and bleeding started after stepdad put his private part in her butt."

Armstead also noted that J.S. had an injury on the posterior forchette. Armstead explained that the number one area of female genitalia where females receive injury, whether it is consensual or nonconsensual sex, is the posterior fourchette. She then pointed to the part of the report showing where there was a healed tear to the proximal aspect of the fossa navicularis on J.S. Armstead said that, during the examination of J.S., that area was very tender to the touch but was beginning to heal. The body heals from the inside out, trying to regenerate skin cells to cover up the open injured area.

5

J.S. made three recorded pretextual telephone calls to appellant to see "if he would admit to what he did." Using her cell phone, J.S. made the first call while at the Midland Police Department; she made the other two calls from the center where she received therapy. Detective Therwanger was with J.S. when she made the calls. The calls were made before appellant was indicted in either Ector County or Midland County. The State introduced the recordings into evidence through Detective Therwanger. She explained that pretextual calls were usually made at the beginning of the investigation.

During the first call, appellant spoke primarily about how God was working with him, how he had strayed away from God, and how God had brought him back. J.S. told appellant that she wanted to go home, and he told her to call him later, stating that, if he did not answer, it was because someone else was around him. During the second phone call, appellant continued to tell J.S. how God was changing him and how, if she came back, they would be a church-going family. When J.S. asked him if she could come home, he asked if anyone was with her. After she said there was not, appellant said that J.S. would have to talk to his lawyer. Then he referred to "[t]hat thing that happened" but only said that they had to put everything in God's hands. He told J.S. that he wanted "to be the God-fearing man that [he] should have been a long time ago."

During the third call, J.S. asked how appellant was doing; his response was that he was changing and that, "if you [J.S.] feel that you cannot be comfortable around me and to my face, I understand that." At one point, appellant referred to what had been done to him when he was young and said that he had learned to forgive even though he was still around the people who had done something to him. When J.S. asked why he had touched her and why he had sex with her, appellant said that she needed to get with her mother to see if she wanted to come back. His answer was the same when J.S. asked the question again. When pressed to promise that things would be different, appellant kept repeating how he had changed. He never denied the assaults.

The only defense witness was J.S.'s mother, appellant's wife. She testified that she did not believe that appellant had ever sexually assaulted J.S. She expressed her opinion that everything was fine until J.S. became friends with Veronica and talked on the phone with Veronica excessively. Appellant did not testify.

*Appellant's Motion for New Trial*

In a motion for new trial, appellant urged the same arguments he now urges on appeal. An appellate court reviews a trial court's denial of a motion for new trial under an abuse of

discretion standard. We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable. A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *State v. Herndon*, 215 S.W.3d 901, 906 n.16 (Tex. Crim. App. 2007); *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006); *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). The trial court's decision is afforded deference on any underlying factual determinations. *Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005). We must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party. Thus, a trial court abuses its discretion only when no reasonable view of the record could support the trial court's ruling. *Charles*, 146 S.W.3d at 208.

*Ineffective Assistance of Counsel*

In ineffective assistance of counsel challenges, an appellate court first determines whether appellant has shown that counsel's representation fell below an objective standard of reasonableness and, if so, then determines whether there is a reasonable probability that the result would have been different but for counsel's errors. *Strickland v. Washington*, 466 U.S. 668 (1984); *Hernandez v. State*, 988 S.W.2d 770, 771 (Tex. Crim. App. 1999); *Hernandez v. State*, 726 S.W.2d 53, 55 (Tex. Crim. App. 1986). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.

In order to assess counsel's performance, we must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances, and to evaluate the conduct from counsel's perspective at the time. We must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, and appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Stafford v. State*, 813 S.W.2d 503, 508–09 (Tex. Crim. App. 1991).

A defendant is not entitled to perfect or errorless counsel. Isolated instances in the record reflecting errors of omission or commission do not render counsel's performance ineffective, nor can ineffective assistance of counsel be established by isolating one portion of trial counsel's performance. *McFarland v. State*, 845 S.W.2d 824 (Tex. Crim. App. 1992). The review is made by examining the totality of the representation. *Strickland*, 466 U.S. at 695. At the hearing on the motion for new trial, the trial court was the sole trier of fact and judge of the credibility of the

7

witnesses and the weight to be given their testimony. Accordingly, the trial judge may have believed or disbelieved all or any part of a witness's testimony, even if that testimony was not controverted.

Finally, because appellant's challenge of ineffective counsel was made to the trial court in a motion for new trial, we analyze the ineffective assistance claim as a challenge to the denial of his motion for new trial. Therefore, we will reverse only if the trial court's decision was arbitrary or unreasonable, viewing the evidence in the light most favorable to the trial court's ruling. *Charles*, 146 S.W.3d at 208; *Shanklin v. State*, 190 S.W.3d 154, 158–59 (Tex. App.—Houston [1st Dist.] 2005), *pet. dism'd*, 211 S.W.3d 315 (Tex. Crim. App. 2007).

Appellant asserts that trial counsel was ineffective because he (1) failed to adequately prepare for trial, (2) failed to develop a theory of defense, and (3) failed to adequately prepare for impeaching the testimony of J.S. and Veronica. At the hearing on his motion for new trial, appellant's new counsel presented an affidavit of J.S.'s mother and called trial counsel, J.S.'s mother, and appellant as witnesses. He relies on their testimony for his arguments here.

Appellant claims that his trial counsel failed to adequately prepare for trial because he did not interview potential witnesses or meet sufficiently with appellant and his family. Appellant's wife claimed that she sent a list of witnesses to trial counsel in May 2009 and that he never interviewed them. The only witnesses she mentioned by name were appellant's mother, Celia Sosa, Brian Perryman of CPS, and J.S.'s younger brother. None of the three testified at the hearing on the motion for new trial. As to Perryman, we have only the wife's hearsay statement that Perryman called her and, during their conversation, said he was surprised that J.S. was not living with her and that he had not approved J.S. to live elsewhere. Perryman was not at the hearing, and appellant did not file an affidavit by Perryman. Appellant contends that Perryman's statement to his wife would have shown that J.S.'s motive for the sexual assault allegations was "to try to get out of the family residence." J.S. testified that she wanted to get out of the family residence but that her reason was to avoid further sexual abuse.

Trial counsel's testimony was not helpful to appellant and directly contradicted appellant's testimony and that of his wife. Trial counsel was first employed as counsel for the Odessa case and was subsequently employed as counsel for the case in Midland. He testified that he was not aware that appellant and his wife believed that he did not communicate with them sufficiently; that he had met with them multiple times during the two years prior to trial;

8

that he was unaware that they desired another meeting; and that he investigated and interviewed appellant, his wife, and family members such as appellant's brother and mother-in-law. Trial counsel explained that usually there are not very many helpful witnesses in a sexual-assault-of-a-child case. Trial counsel admitted that he had to cancel one last appointment immediately before trial but said that "[he] had been working with [appellant] for a couple of years, so one more appointment wasn't going to make a lot of difference."

Trial counsel said that he received the State's discovery over a year before trial. He testified that the Odessa prosecutor gave him everything the State had in the Odessa investigation and that he had received the tape-recorded telephone calls that had been obtained in the Midland investigation. Midland Detective Therwanger was on the prosecution's witness list for the Odessa trial. Trial counsel became concerned when he first listened to the recorded calls. He was of the opinion that there was no need for a pretrial hearing on the admissibility of the tapes because the trial court would have made the same ruling at either time. He was confident that the prosecutor would use the taped conversations as evidence against appellant. Trial counsel also said that the prosecutor had given him a CD of jail telephone calls; however, the State did not introduce those during the trial. Trial counsel said several times that he had been prepared for trial for at least a year and believed that he had addressed all the issues raised by appellant in his motion for new trial.

Appellant argues that trial counsel did not have a theory for his defense and that he failed to adequately cross-examine J.S. and Veronica. We disagree. The defense was that the abuse never happened because J.S.'s mother would have known about it. Appellant admitted that, during trial, trial counsel used the photographs of the bedroom and other exhibits that he and his wife had provided. Trial counsel extensively cross-examined J.S., demonstrating numerous contradictions in her testimony and how implausible it was that J.S. claimed that much of the abuse occurred in the small bedroom at the foot of appellant's bed without his wife knowing about it. Trial counsel emphasized the size of the small room in his final argument. It is possible that the jury may have concluded that the wife knew about the abuse but chose to ignore it and stay with appellant.

Appellant admitted that trial counsel also used the telephone records they had provided him. Trial counsel impeached Veronica through the use of those telephone records. In view of the records, Veronica acknowledged that she and J.S. must have visited on the phone numerous

9

times during the three or four months prior to February 2009. In final argument, trial counsel suggested that perhaps Veronica had been grooming J.S. by calling J.S. and by showing J.S. how nice it would be to leave her family to live with Veronica. During trial, trial counsel cross-examined both J.S. and Veronica, attempting to lay a foundation for that final argument. Again, the jury believed J.S. and Veronica and did not believe appellant's wife when she contended that Veronica caused J.S. to make the accusations of abuse.

Appellant's wife referred to medical records concerning J.S.'s constipation problems. Appellant argues that those records could have been used to refute the statement by J.S. to the SANE nurse that she was not having constipation problems. Trial counsel testified that appellant's wife had shown him the records but that he was of the opinion that the records should not be used because appellant had not been indicted for anal penetration. The records were not introduced at the hearing; therefore, they are not part of the record for us to review.

Appellant now contends that he wanted to testify to refute J.S.'s testimony. Trial counsel testified at the hearing that he recommended that appellant not testify, and appellant said that he just followed that recommendation. In view of appellant's numerous incriminating statements during the recorded telephone calls, trial counsel's advice appears to have been well-founded. The prosecutor could have questioned appellant about each statement in detail, thereby emphasizing them to the jury even more than they were emphasized in the recordings.

Appellant also claims that trial counsel was ineffective in not challenging the qualifications of the sexual assault nurse examiner, Armstead, and in not filing a *Daubert*[1] motion to challenge the medical testimony. We disagree. Armstead testified that she was the director of emergency services at Midland Memorial Hospital and the director and coordinator for the sexual assault program. She had been a registered nurse for sixteen years and was currently working on a masters degree at Texas Tech. She testified that she had performed over 450 sexual assault examinations. Practicing in both Odessa and Midland, trial counsel no doubt was well aware of Armstead's qualifications. Appellant has provided no evidence to support his contention that trial counsel should have challenged Armstead's qualifications or the medical evidence. The medical evidence fully supported J.S.'s allegations that appellant had penetrated her on numerous occasions: the jagged hymen, the healing tear on her anus, and the healed tear

---

[1] *Daubert v. Merrell Dow Pharm., Inc*, 509 U.S. 579 (1993).

10

to the proximal aspect of the fossa naviculaisr (the injury to her posterior fourchette).[2] Appellant has referred us to no evidence to support a *Daubert* challenge by trial counsel.

Appellant has not demonstrated by a preponderance of the evidence that trial counsel failed to provide effective assistance of counsel during his trial. Appellant's first issue is overruled.

### The Order in Limine

In appellant's second issue, he contends that the trial court erred in not granting a mistrial when the prosecutor violated the trial court's order that the State was not to indicate that charges had been filed against appellant in Midland.

At the beginning of J.S.'s testimony, the prosecutor began to question J.S. concerning appellant's first inappropriate touching of J.S. that occurred in Midland. Appellant objected on the basis of relevance and asked to approach the bench. In response, the prosecutor informed the trial court that this case involved continuous acts that started in Midland in 2002 and continued until 2009 when J.S. made her outcry. The trial court ruled as follows:

> The ruling will be this. You can go into it but do not indicate whether or not anything was filed anyplace else. I don't know if they have or not but if they have --

The prosecutor advised the court that something had been filed in Midland; the court instructed him to "not approach that at all." The prosecutor said he would not but then said, "There is the Midland investigation (inaudible)," and the court responded, "That will be fine." Apparently the prosecutor interpreted the court's last statement to be an approval of a reference to the Midland investigation; however, the court clarified his ruling during the later direct examination of Midland Detective Therwanger.

The prosecutor asked Detective Therwanger if she thought there was enough probable cause to have an arrest warrant issued based on the pretext phone calls and J.S.'s statement. The trial court overruled appellant's first objection that the subject was not relevant. When the prosecutor asked the question again, Detective Therwanger answered, "Yes," and in a bench conference, the court sustained trial counsel's objection. The prosecutor stated that he thought trial counsel's objection earlier was to any reference to "indicted charges." The court corrected the prosecutor and stated that he had violated the earlier order in limine. Appellant moved for a

---

[2]The fossa navicular is defined as the depression between the vulva and fourchette. TABER'S CYCLOPEDIC MEDICAL DICTIONARY 824 (19th ed.).

11

mistrial, which the trial court denied. He then asked for the standard instruction, and the court instructed the jury to disregard the last answer of Detective Therwanger and to not consider it for any purpose.

The denial of a mistrial is reviewed under an abuse of discretion standard. *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999); *State v. Gonzalez*, 855 S.W.2d 692, 696 (Tex. Crim. App. 1993). A mistrial is proper when the error "is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). A mistrial is required only when the error "was clearly calculated to inflame the minds of the jury or was of such damning character as to suggest it would be impossible to remove the harmful impression from the juror's minds." *Young v. State*, 283 S.W.3d 854, 878 (Tex. Crim. App. 2009).

The prosecutor violated the order in limine. The court allowed him to question J.S. about how the abuse started while the family lived in Midland and to refer to the investigation of the victim's accusations in Midland. The earlier exchange between the court and the prosecutor was somewhat ambiguous; however, the prosecutor should have approached the bench instead of running the risk of violating the earlier order in limine and jeopardizing what was a strong case against appellant.

However, we do not find that the trial court's denial of a mistrial was an abuse of discretion. The trial court instructed the jury to disregard the brief exchange between the prosecutor and Detective Therwanger and not to consider it for any reason. The law generally presumes that instructions to disregard and other cautionary instructions will be obeyed by the jury. *Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987). Appellant's second issue is overruled.

### The Pretextual Telephone Calls

J.S. made three calls from her cell phone to appellant's cell phone that she recorded. Detective Therwanger loaned J.S. a recorder that J.S. could easily operate. J.S. made the first call in the presence of Detective Therwanger at the Midland Police Department; the other two calls were made by J.S. at the center where she received therapy from Steve Hansen. When the calls were made on her cell phone from the center, Hansen, Detective Therwanger, and Veronica were present.

12

Outside the presence of the jury, trial counsel objected to admission of the recordings on the basis that they violated appellant's right to counsel. He argued that they were made at the direction of a law enforcement officer who knew appellant had counsel. In response, the State pointed out that (1) the calls were made in connection with the Midland Police Department investigation, not the Odessa Police Department investigation; (2) the calls were not custodial interrogations by law enforcement; and (3) the calls were made by one individual, who knew they were being recorded, to another individual. The trial court ruled that the recordings were admissible. In a voir dire examination, J.S. admitted that a Midland police officer was with her when she made the calls, but she said that the officer did not help her operate the equipment and did not tell her what to say. J.S. admitted that she called appellant to get him to acknowledge what he did.

A trial court has discretion in deciding whether to admit or exclude evidence, and an appellate court will not overturn the trial court's determination as long as it was within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). An appellate court must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002). The trial court's ruling is reviewed in light of what was before the trial court at the time the ruling was made. *Id.*

Appellant was arrested in March 2009 by Ector County law enforcement. Trial counsel made his bond and filed an affidavit with the Ector County Sheriff that he was appellant's attorney. At the time the three calls were made by J.S. in September 2009, appellant had been arrested and was out on bond in Ector County. Appellant had not been indicted in either Ector County or Midland County. At that time, appellant had not been charged in Midland County.

Detective Therwanger testified that the pretext calls were made as a part of her investigation. When asked to explain to the jury what "pretext" meant from a police standpoint, Detective Therwanger gave the following explanation:

> Well, it is just -- it is before the fact, before the actual contacting of him. It is the beginning of your investigation, before any contact is made, it is a surprise call. If he were to know that I had an investigation in Midland, he might not talk to her. And he might not talk to her at all. It is just the beginning of the investigation.

13

Detective Therwanger admitted that the purpose of the pretext calls was, if possible, to obtain statements that might be incriminating.

When asked by trial counsel whether she knew that appellant was already on bond when the calls were made in September 2009, Detective Therwanger responded that she "knew there had been an Odessa case." Trial counsel then asked whether she knew that appellant had an attorney for that case. She answered, "I have no idea about that." She testified that she had not talked to any of the Ector County authorities about the Ector County case.

Detective Shelly Stanford with the Odessa Police Department investigated the case in Ector County. She learned of the allegations related to the Ector County case from Rhonda Dominey of Child Protective Services. Detective Stanford testified that she first became involved in the case in February 2009, and at some point she was notified by appellant that he was represented by counsel. She recalled that appellant was arrested in March 2009. Detective Stanford did not recall any contact or conversation with Detective Therwanger of Midland.

Appellant argues that knowledge of Ector County law enforcement that appellant had counsel should be imputed to Midland County law enforcement. As authority, appellant cites the following statement in *Herron v. State*, 86 S.W.3d 621, 628 (Tex. Crim. App. 2002):

> One officer's knowledge that a defendant has requested counsel is imputed to every other state agent. *See Arizona v. Roberson*, 486 U.S. 675, 687–88, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

That statement was made in relation to custodial interrogation. *Herron* and *Roberson* were concerned with a defendant's right to have counsel present during a custodial interrogation by the police. The phone calls from J.S. to appellant did not involve custodial interrogations by the Midland police.

The Supreme Court in *Montejo v. Louisiana*, 556 U.S. 778 (2009), expressly overruled *Michigan v. Jackson*, 475 U.S. 625 (1986). The Court in *Jackson*, a Sixth Amendment case, had held that, if police initiate interrogation after a defendant's assertion of his right to counsel, at an arraignment or similar proceeding, any waiver of the defendant's right to counsel for police-initiated interrogation is invalid. *Montejo*, 556 U.S. at 782. In overruling *Jackson*, the Court reasoned that the protections provided against police badgering by the Fifth Amendment cases— *Miranda v. Arizona*, 384 U.S. 436 (1966); *Edwards v. Arizona*, 451 U.S. 477 (1981); and

14

*Minnick v. Mississippi*, 498 U.S. 146, 153 (1990)—were sufficient protection and that the additional presumption of invalidity in *Jackson* was not needed:

> Under the *Miranda-Edwards-Minnick* line of cases (which is not in doubt), a defendant who does not want to speak to the police without counsel present need only say as much when he is first approached and given the *Miranda* warnings. At that point, not only must the immediate contact end, but "badgering" by later requests is prohibited. If that regime suffices to protect the integrity of "a "suspect's voluntary choice not to speak outside his lawyer's presence" before his arraignment, *Cobb*, 532 U.S. at 175, 121 S.Ct. 1335 (KENNEDY, J., concurring), it is hard to see why it would not also suffice to protect that same choice after arraignment, when Sixth Amendment rights have attached. And if so, then *Jackson* is simply superfluous.

*Montejo*, 556 U.S. at 794–95.

The Texas Court of Criminal Appeals in *Pecina v. State*, 361 S.W.3d 68 (Tex. Crim. App. 2012), clarified for Texas courts the distinction after *Montejo* between a Fifth Amendment right to interrogation counsel and the Sixth Amendment right to counsel which also provides protection to a defendant against police badgering during custodial interrogations. The Fifth and Fourteenth Amendments to the Constitution of the United States guarantee the right to not be compelled to testify against oneself. U.S. Const., amend. V, XIV. As pointed out in *Pecina*, the Fifth Amendment does not expressly provide for a right to counsel, but the rights created by *Miranda*, including the right to have counsel present during custodial interrogation, were set forth as measures to insure that the right against compulsory self-incrimination is protected. Both *Pecina* and *Montejo* refer to the "Fifth Amendment right to interrogation counsel" as a way to distinguish the right to have counsel before any custodial questioning from the Sixth Amendment right to trial counsel. *Pecina*, 361 S.W.3d at 74 n.16.

The Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings; custodial interrogation is such a stage. *Montejo*, 556 U.S. at 786. The Sixth Amendment right to trial counsel is triggered by judicial arraignment or Article 15.17 magistration in Texas. *Pecina*, 361 S.W.3d at 71; *see* TEX. CODE CRIM. PROC. ANN. art. 15.17 (West Supp. 2012). The Fifth Amendment right to interrogation counsel applies to custodial interrogation before and after magistration. Each right is invoked and waived in exactly the same manner—under the Fifth Amendment prophylactic rules. *Pecina*, 361 S.W.3d at 71.

15

In *Miranda*, 384 U.S. 436, the Supreme Court held that custodial interrogation is inherently coercive and violates a defendant's privilege against self-incrimination unless the defendant is warned of certain rights. A criminal defendant must be advised of his or her right to have counsel present in order to counter the inherently coercive atmosphere of custodial interrogation. The Court in *Edwards* clarified *Miranda*, holding that a suspect who has "expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him *unless the accused himself initiates further communication*." 451 U.S. at 484–85 (emphasis added). The purpose of the *Edwards* rule is to "prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Pecina*, 361 S.W.3d at 75. In *Herron*, the Texas Court of Criminal Appeals found that the knowledge of the arresting officer (that defendant wanted an attorney) was imputed to the investigating officer; therefore, the first custodial interview was not admissible. 86 S.W.3d 621. The court held, however, that the defendant had initiated the second interview; therefore, under *Edwards*, the defendant had waived his previously asserted right to counsel for the purposes of that custodial interview. *Id.* at 629.

In *Roberson*, the Supreme Court expanded the *Edwards* rule to bar police-initiated interrogation following a suspect's request for counsel in the context of a separate police investigation. 486 U.S. 675. Roberson had been arrested at the scene of a just-completed burglary when he told the arresting officer that he "wanted a lawyer before answering any questions." *Id.* at 678. The officer recorded the request in his written report. Three days later, while Roberson was still in custody, a different officer interrogated Roberson about a different burglary that had occurred a day before his arrest. That officer was not aware that Roberson had requested counsel. After advising Roberson of his *Miranda* rights, the officer obtained an incriminating statement concerning the earlier burglary. Apparently, the two officers were on the same police force because the Supreme Court specifically noted that the second officer "simply failed to examine [the first officer's] report." *Id.* at 687. The Supreme Court held that statement had to be suppressed, emphasizing that Roberson had indicated "that he did not feel sufficiently comfortable with the pressures of custodial interrogation to answer questions without an attorney." *Id.* at 684. The Court pointed out that this discomfort was precisely the state of mind that *Edwards* presumes to persist unless the suspect himself initiates further conversation with the police. *Id.*

16

At the time of the phone calls from J.S., appellant's Sixth Amendment rights had not attached in Midland; he had not been arrested in Midland. Appellant was not in custody during the phone calls from J.S.; appellant was not being subjected to a "coercive" police interrogation when he talked with J.S. The principal point is that the underlying rationale of all the cases—protection from badgering by police during a custodial interrogation—was not implicated. As the *Montejo* Court stated, "When a defendant is not in custody, he is in control, and need only shut his door or walk away to avoid police badgering." 556 U.S. at 795. There was no badgering by police here, and appellant could have refused to talk with J.S.

Aside from the absence of custodial interrogation, appellant's contention presents another problem. Carried to a logical conclusion, appellant's argument would mean that separate law enforcement entities would have to incur the burden of continuously checking with every other law enforcement entity in every investigation to see if a suspect has been arrested in another jurisdiction and, if so, on what charges, and then ascertain whether he or she is represented by an attorney. Here, the investigation of appellant in Midland was in its early stages when the pretextual calls were made. There is no evidence that the two police departments were coordinating their investigations. We hold that the trial court did not abuse its discretion in admitting the recorded cell phone calls. Appellant's third issue is overruled.

*Prosecutor's Comment On Appellant's Failure To Testify*

In appellant's fourth issue, he argues that the prosecutor committed prosecutorial misconduct in making a "speaking objection" that criticized appellant's constitutionally protected right not to testify.

Article 38.08 of the Texas Code of Criminal Procedure provides that, while a defendant may testify in his own behalf, his failure to testify "shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause." TEX. CODE CRIM. PROC. ANN. art. 38.08 (West 2005). Argument will constitute comment upon the defendant's failure to testify if the language used is manifestly intended or is of such character that the jury would naturally and necessarily take it to be a comment on the accused's failure to testify. *Caldwell v. State*, 818 S.W.2d 790, 800 (Tex. Crim. App. 1991). Argument is improper if it directs the jury's attention to an absence of testimony that only the defendant could supply. *Moore v. State*, 849 S.W.2d 350, 352 (Tex. Crim. App. 1993); *Swallow v. State*, 829 S.W.2d 223, 225 (Tex. Crim. App. 1992).

17

During closing argument, trial counsel addressed the pretext phone calls and attempted to explain why appellant may have chosen not to deny the sexual assaults when J.S. asked him about the assaults:

> [DEFENSE COUNSEL]: And think about this: When you are talking to a girl that you know is that volatile that has made allegations against you which aren't true and she sounds like she is coming around to normal, "Hey, Dad, I miss you. Hey, I wish I was home," you say, "Hey, maybe she is coming back to normal. Maybe all of that was just something she was going crazy about. Maybe she is coming home now. We are going to be a family again," and then she spouts this out, "Why did you do that to me," maybe the best thing to do is just not approach it because it's like, "You know what? No matter what I say, I don't want her to freak out again and go, 'Oh[']" -- You don't know you are being recorded so, You know.
>
> Now, if you knew you were being recorded, of course you would go, "Why are you saying that? I didn't do it," if you knew you were being recorded. But of course, then the Prosecution would say, "Well, of course, they are going to deny it. What else are they going to do?" So there is no real winning that situation. So when you are just -- if you think about it and you are talking to the girl and you are hoping she is going to come home and be with her mom and have a family again --
>
> [PROSECUTOR]: Your Honor, we object to the line of this argument. The Defendant had an opportunity to testify. He had the choice of whether to testify or not to. He could have gotten up and explained what those answers were. Allowing Defense attorney to give explanations in closing argument is improper.
>
> THE COURT: Overruled.
>
> [DEFENSE COUNSEL]: I object to the comment on my client not taking the opportunity to testify.

The trial court then had the attorneys approach the bench. The prosecutor argued that he had not made a comment on the defendant not testifying, but only that he had the right to testify or not testify, and that trial counsel's argument was improper. The trial court disagreed and stated that appellant's argument was not improper and that the prosecutor's objection was overruled. Appellant's counsel then requested that the court instruct the jury that the defendant was not required to testify. The court then instructed the jury as follows:

> Ladies and gentlemen, I am going to refer you to the Charge that I read to you and that you will have in your possession shortly as -- and it tells you the law concerning whether or not the Defendant testifies or does not testify and his rights thereto.

18

Without further objection, appellant's counsel then proceeded with his argument, urging the jury to consider how a person might respond to somebody he knows is irrational and who has made irrational charges against him.

Appellant acknowledges the general rule that there must be a timely, proper, and specific objection to a prosecutor's complained-about jury argument in order for a defendant to preserve the complaint for appellate review purposes. *Miller v. State*, 741 S.W.2d 382, 391 (Tex. Crim. App. 1987); *Borgen v. State*, 672 S.W.2d 456, 457 (Tex. Crim. App. 1984). An exception to the general rule is that improper argument may result in a Fourteenth Amendment due process claim if the prosecutor's argument so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Miller*, 741 S.W.2d at 391 (citing *Darden v. Wainwright*, 477 U.S. 168 (1986)).

The trial court overruled the State's "speaking objection" and, as requested by appellant, gave an instruction to the jury to refer to the portion of the charge dealing with the right of a defendant to testify or not testify that the court had read to them. Normally, an instruction to disregard will generally cure improper jury argument. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000); *Woods v. State*, 653 S.W.2d 1, 5 (Tex. Crim. App. 1983).

Appellant did not move for a mistrial and did not preserve his complaint for our review. The State's objection was an improper comment on appellant's failure to testify; the comments were of such a character that the jury would have taken the objection to be a comment on appellant's failure to testify. *See Caldwell*, 818 S.W.2d at 800; *Allen v. State*, 693 S.W.2d 380, 384 (Tex. Crim. App. 1984). However, we do not find that the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.

An appellate court ordinarily should not overturn a criminal conviction on the basis of a prosecutor's closing argument, standing alone, especially when the trial court gives the jury a curative instruction. *Herndon*, 215 S.W.3d at 908. Even if appellant had requested a mistrial, the remarks by the prosecutor must have been a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial. *Wesbrook*, 29 S.W.3d at 115.

In the bench conference at trial, the prosecutor argued that his objection was in response to defense counsel's argument in which defense counsel speculated on what appellant would have said on the witness stand. But his objection could have been limited to a statement that the

19

argument was improper, and he could have made a request to explain why at a bench conference. Even if the prosecutor's statement was invited by the argument of defense counsel, which the prosecutor apparently believed at the time, the "idea of 'invited response' is used not to excuse improper comments but to determine their effect on the trial as a whole." *Darden*, 477 U.S. at 182.

The prosecutor's comment cannot be excused; however, we do not find that his statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." The trial court overruled the prosecutor's objection and then instructed the jury to refer to the portion of the charge dealing with a defendant's right to testify:

> In this case, the defendant has elected not to testify; and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against him.

In addition, there was substantial evidence against appellant. J.S.'s testimony was extensive and detailed. Her description of the assaults to the other witnesses and to the jury remained constant despite lack of support from her mother. The jury chose to believe J.S., Veronica, and J.S.'s therapist rather than J.S.'s mother's contention that no assaults happened. The SANE nurse introduced medical evidence that demonstrated severe injuries to J.S.: her hymen had irregular edges, and "it was not smooth and symmetrical like you see in children that have not been penetrated or have not begun having sexual intercourse"; her anal area had a healing tear in an area where injuries normally heal unless "that area keeps being penetrated"; and her posterior fourchette had been injured. Armstead explained that the posterior fourchette is the number one area of female genitalia where females receive injury, whether it is consensual or nonconsensual sex. J.S. testified that, because of her injuries, she continued to be treated by doctors. The jury took less than an hour to reach its verdict of guilty on each of the twenty charges.

Although we have found no reversible error in connection with the prosecutor's "speaking objection" that commented on appellant's failure to testify, we fail to understand why a prosecutor would jeopardize a case with comments that are clearly out of bounds. As we have stated, we are not unmindful of the pace and stress of trial. However, one would think that, even in the "heat of battle," the risk of retrial would be caution enough to yield to cooler passions. Although the comments in this case were held to result in harmless error, that will not always be

20

the case. *See Baker v. State*, No. 11-10-00329-CR, 2012 WL 5988900 (Tex. App.—Eastland, Nov. 29, 2012, no pet. h.) (mem. op., not designated for publication). Appellant's fourth issue is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


January 31, 2013

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.

21